**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ACCELERATED CARE PLUS CORP., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> DIVERSICARE MANAGEMENT SERVICES ) <br> CO. et al., ) <br> ) <br> Defendants. ) <br> ) | 3:11-cv-00585-RCJ-RAM <br><br> **ORDER** |

Presently before the Court is Plaintiff Accelerated Care Plus Corp.'s ("ACP") *Ex Parte* Motion for Temporary Restraining Order (ECF No. 2). The Court held a hearing on this matter on August 12, 2011. The findings herein are made for the purpose of entry of this Temporary Restraining Order and are preliminary in nature.

**I.   BACKGROUND**

ACP is a Nevada corporation which provides a variety of services and products to approximately 5000 skilled nursing and therapy facilities throughout the United States (with the exception of Alaska). Although ACP leases medical equipment to health care facilities, ACP specializes in providing its own training and usage methods for that equipment to skilled nursing and physical therapy facilities. ACP has compiled its treatment methods into various written materials which include step-by-step guides, handbooks, training programs, and other instruction materials (the "Written Materials").

Defendant Diversicare Management Services Co. ("Diversicare") operates more than 40 skilled nursing care facilities in the southern United States and has been a customer of ACP for

the past five years. Diversicare leased ACP's medical equipment and its services, including copies of its Written Materials and instruction on ACP's treatment methods. Diversicare expressly acknowledged in its agreements with ACP that it would not use the Written Materials for any purpose other than providing clinical services using ACP's equipment during the course of the lease. Diversicare further expressly agreed that it would not modify, improve upon, or create derivative works based upon, duplicate, market, sell or exploit the Written Materials in whole or in part either during or after the contracts' termination.

Until approximately August 4, 2011, Defendant Emile Roumen held the position of Regional Manager of Training and Compliance with ACP. In that capacity, Roumen's primary job responsibility was to conduct on-site training sessions with customers' clinical staff, and Roumen became very knowledgeable regarding ACP's treatment methods and Written Materials. Until approximately June 3, 2011, Defendant Joseph Pannell was employed by ACP as a Vice President of Sales. In that capacity, Pannell was privy to high-level information relating to ACP's strategic plans and business model, and was also very knowledgeable and skilled regarding ACP's treatment methods and Written Materials. As part of their employment with ACP and because their positions necessitated access to ACP's treatment methods and Written Materials, Roumen and Pannell agreed to the terms of Confidentiality and Intellectual Property Rights Agreements (the "Roumen Agreement" and the "Pannell Agreement"), which they both separately acknowledged and signed. The Roumen and Pannell Agreements contain non-competition, non-diversion, and non-solicitation clauses, as well as certain confidentiality provisions.

On June 3, 2011, Pannell left his employment with ACP for a position with Diversicare (or an entity affiliated with Diversicare) as its Vice President of Development. On August 4, 2011, Roumen left his employment with ACP for a position with Diversicare (or an entity affiliated with Diversicare) as its Vice President of Clinical Education. Both of these positions are functionally equivalent to those Roumen and Pannell held at ACP. ACP has since discovered that prior to Roumen's departure, Roumen had logged into ACP's password-

protected database and downloaded the entire library of ACP's Written Materials.

## II. LEGAL STANDARD

Under Fed. R. Civ. P. 65(b), a plaintiff must make a showing that immediate and irreparable injury, loss, or damage will result to plaintiff without a temporary restraining order. Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order."). The standard for obtaining *ex parte* relief under Rule 65 is very stringent. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006). The temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

The Ninth Circuit in the past set forth two separate sets of criteria for determining whether to grant preliminary injunctive relief:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.*

The Supreme Court recently reiterated, however, that a plaintiff seeking an injunction must demonstrate that irreparable harm is "likely," not just possible. *Winter v. NRDC*, 129 S. Ct. 365, 374–76 (2008) (rejecting the Ninth Circuit's alternative "sliding scale" test). The Ninth Circuit has explicitly recognized that its "possibility" test was "definitively refuted" in *Winter*, and that "[t]he proper legal standard for preliminary injunctive relief requires a party to

Page 3 of 13

demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 129 S. Ct. at 374) (reversing a district court's use of the Ninth Circuit's pre-Winter, "sliding-scale" standard and remanding for application of the proper standard).

A recent Ninth Circuit ruling relying largely on the dissenting opinion in *Winter* parsed the language of *Winter* and subsequent Ninth Circuit rulings and determined that the sliding scale test remains viable when there is a lesser showing of likelihood of success on the merits amounting to "serious questions," but not when there is a lesser showing of likelihood of irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011). This case presents some difficulty in light of *Winter* and prior Ninth Circuit cases. To the extent *Cottrell*'s interpretation of *Winter* is inconsistent with *Selecky*, *Selecky* controls. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (holding that, in the absence of an intervening Supreme Court decision, only the en banc court may overrule a decision by a three-judge panel). In any case, the Supreme Court stated in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the merits, that he is *likely* to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374 (citing *Munaf v. Geren*, 128 S. Ct. 2207, 2218–19 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)) (emphases added). The test is presented as a four-part conjunctive test, not as a four-factor balancing test, and the word "likely" modifies the success-on-the-merits prong in exactly the same way it separately modifies the irreparable-harm prong. In rejecting the sliding-scale test, the *Winter* Court specifically emphasized the fact that the word "likely" modifies the irreparable-injury prong, *see id.* at 375, and the word modifies the success-on-the-merits prong the same way, *id.* at 374. In dissent, Justice Ginsburg opined that she did not believe the Court was abandoning the rule that it was permissible to "award[ preliminary injunctive] relief based on a lower likelihood of harm when

the likelihood of success is very high." *Id.* at 392 (Ginsburg, J., dissenting). But Justice Ginsburg, like the majority, did not address whether she believed relief could be granted when the chance of success was *less than* likely. A "lower likelihood" is still *some* likelihood. We are left with the language of the test, which requires the chance of success on the merits to be at least "likely."

In summary, to satisfy *Winter*, a movant must show that he is "likely" to succeed on the merits. "Likely" means "having a high probability of occurring or being true." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/likely. Black's defines the "likelihood-of-success-on-the-merits test" more leniently as "[t]he rule that a litigant who seeks [preliminary relief] must show a reasonable probability of success . . . ." *Black's Law Dictionary* 1012 (9th ed. 2009). The Court must reconcile the cases by interpreting the *Cottrell* "serious questions" requirement to be in harmony with the *Winter*/*Selecky* "likelihood" standard, not as being in competition with it. "Serious questions going to the merits" must mean that there is at least a reasonable probability of success on the merits. "Reasonable probability" appears to be the most lenient position on the sliding scale that can satisfy the requirement that success be "likely."

### III. DISCUSSION

In order to establish a claim for misappropriation of trade secrets under Nevada law, ACP must show: (1) a trade secret; (2) misappropriation of the trade secret through use, disclosure or non-disclosure or use of the trade secret; and (3) the misappropriation was wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose. *See Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000). ACP has not established a likelihood of proving that its treatment methods constituted trade secrets. Although customer lists and particular applications to particular customers may constitute trade secrets, the Court finds it unlikely that the methods of using certain equipment constituted trade secrets. Plaintiff alleges no patent infringement, and it admits that it provides training in its methods to outside facilities.

ACP also seeks injunctive relief to enforce the terms of the Roumen and Pannell Agreements, particularly the non-diversion and non-competition portions. Nevada law allows for the enforcement of reasonable restrictive covenants in employment agreements, and recognizes that a valid, restrictive covenant may be enforced by way of temporary and permanent injunctive relief. *See* Nev. Rev. Stat. § 613.200. Restrictive employment covenants must be enforced if the terms are reasonable with respect to the time limitation, geographical territory, and hardship on the respective parties. *See Jones v. Deeter*, 913 P.2d 1272 (Nev. 1996) (establishing the factors to consider in employment noncompetition covenants: time, territory and hardship); *Hansen v. Edwards*, 426 P.2d 792 (Nev. 1967) (holding that the time period and geographic territory must be considered in determining the reasonableness of the restrictive covenants).

Here, the Roumen and Pannell Agreements provide restrictive covenants which prevent Roumen and Pannell from competing with ACP, soliciting employees of ACP, and inducing customers to curtail their business with ACP. All of the restrictive covenants run for a period of one year from the date of termination of employment. Thus, Roumen and Pannell are required to refrain from engaging in such activity during the pendency of their employment and for a one-year period after termination: June 3, 2011 through June 3, 2012 for Pannell and August 4, 2011 through August 4, 2012 for Roumen. The Court finds that the one-year period is reasonable, under these circumstances, and Nevada courts have upheld restrictive covenants for even longer periods. *See Ellis v. McDaniel*, 596 P.2d 222 (Nev. 1979) (upholding a two-year restrictive covenant). Here, Roumen and Pannell were key employees of ACP who have gained extensive knowledge of ACP's treatment methods, Written Materials, and business strategy and models. In light of their knowledge of the industry, training received during their affiliation and employment with ACP, and access to ACP's confidential information, a one-year restrictive covenant period is reasonable to protect ACP's legitimate business interests.

With respect to the geographic scope of the Roumen and Pannell Agreements, the Nevada Supreme Court has recognized that the geographic scope of a restrictive covenant should

be no greater than reasonably to protect the employer's legitimate business interests. *See Hansen*, 426 P.2d at 793. In the case of a localized or regional business, a geographic limitation in a restrictive covenant would reasonably address any possible harm that employer may suffer. However, courts have recognized that when an employer's business is national in scope, an unlimited geographical scope may be reasonable so long as the field is sufficiently limited. *See Lowry Computer Prods., Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997) (upholding one-year non-competition clause of unlimited geographic scope where employer had accounts in forty-eight states and where clause was limited to competing businesses); *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 477 (E.D. Pa. 2007) (upholding one-year non-competition and confidentiality agreement of unlimited geographic scope where employer was international enterprise). Indeed, as the Third Circuit has astutely recognized, "[i]n this Information Age, a per se rule against broad geographic restrictions would seem hopelessly antiquated." *Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007). The court noted that many courts have found broad geographic restrictions reasonable "so long as they are roughly consonant with the scope of the employee's duties." *Id.*

Here, while the restrictive covenants of the Roumen and Pannell Agreements have no geographic scope, they are tailored to prohibit subsequent employment in a similar position with a similar or competitive business. ACP is a national business in all states except Alaska, and both Roumen and Pannell are currently employed in the same regions in which they worked for ACP anyway. Should ACP's confidential information (known by employees such as Roumen and Pannell) be used in competition against it, ACP's business could be affected anywhere. Moreover, within the realm of Restricted Employers, Roumen and Pannell may accept a position so long as their "job responsibilities and functions do not relate in any way to the goods and services that are the same as or similar to the goods and services provided by ACP," and so long as they do not "disclose any of a type ACP Information in the course of his or her employment with the Restricted Employer." Hence, in this instance, the scope of the non-competition clause

is reasonable and roughly consistent with the scope of Roumen and Pannell's duties while employees of ACP.

With respect to the balancing of hardships, the Nevada Supreme Court has recognized that employers and businesses commonly rely upon restrictive covenants to safeguard important business interests. *See Traffic Control Services, Inc. v. United Rentals Nw., Inc.*, 87 P.3d 1054, 1057 (2004). Such restrictive covenants should be enforced to protect those legitimate business interests. *See Hansen*, 426 P.2d at 792 (restrictive covenants will be upheld if they are reasonably necessary to protect the goodwill and business of the contracting party). Injunctions are the only method of effective enforcement for covenants that are limited in duration. *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 982 (D. Ariz. 2006).

"Where the public interest is not directly involved, the test usually stated for determining the validity of the [non-competition] covenant as written is whether it imposes upon the employee any greater restraint than is reasonably necessary to protect the business and good will of the employer." *Hansen*, 426 P.2d at 793. In other words, ACP has the right to protect its business and goodwill if no undue hardship results to Roumen and Pannell. There is no undue hardship in allowing Roumen and Pannell to work for a Restricted Employer so long as they are in compliance with the terms of those agreements, i.e., so long as their "job responsibilities and functions do not relate in any way to the goods and services that are the same as or similar to the goods and services provided by ACP," and so long as they do not "disclose any of a type ACP Information in the course of his or her employment with the Restricted Employer." This balances the hardships of prohibiting Roumen and Pannell from employment with Diversicare, with ACP's interest in protecting its business. Based on the foregoing, the Court can preliminarily conclude that ACP can succeed on the merits of its breach of contract claims.

Irreparable harm can be caused by "acts committed without just cause" and "which unreasonably interfere with a business or destroy its credits or profits." *Sobol v. Capital Mgmt. Consultants, Inc.*, 726 P.2d 335, 337 (Nev. 1986). Irreparable harm can be shown when

interference with a legitimate business causes public confusion, infringement on goodwill, and damage to the reputation of the business. *Id.* A preliminary injunction is an appropriate remedy for violations of a non-solicitation agreement and to prevent trade secret misappropriation. *E.g.*, *W.R. Grace & Co. v. Mouyal*, 422 S.E.2d 529 (Ga. 1992). Irreparable harm is easily shown when a former business associate uses the knowledge gleaned from a former business to compete against that business in violation of a non-compete. *JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir. 1993).

Here, given the timing and sequence of the events of this case, the Court can infer that Roumen intends to use and disclose ACP's Written Materials in his position at Diversicare, and that Pannell intends to do so, and may have already done so. As a result of Roumen and Pannell's actions, ACP's customer, Diversicare (which included contracts with over 40 Diversicare facilities totaling approximately $600,000.00), has already been diverted. Diversicare, Roumen, and Pannell each contend that they do not intend to use the Written Materials, and that they do not intend to participate in the development, implementation, marketing or sales of services that are competitive with ACP (whether for Diversicare's facilities or for outside entities). However the sequences of events in this case, including Roumen's downloading activity, the timing of Roumen's and Pannell's departures and the timing of Diversicare's cancellation, lead to the inference that this may be what Defendants intend to do.

Stacie Bratcher, a representative of Diversicare Therapy Services ("DTS"), an entity recently created by Diversicare, has testified by declaration that Diversicare and DTS intend to "manage and provide therapy services to DMS owned sites as well as to offer rehabilitation services to non-owned facilities." (*See* Bratcher Decl. ¶4, ECF No. 7-1). This is precisely the service that ACP provided to Diversicare under the terms of its various contracts. Bratcher's admission, coupled with Roumen's downloading activity, the timing of Roumen's and Pannell's departure, and the timing of the cancellation of Diversicare's ACP contracts indicate that Diversicare intends to take ACP's Written Materials and resources and offer ACP's services both internally to Diveriscare-owned facilities and to outside facilities.

It is difficult to calculate the value of the harm to ACP if Defendants were to use and disclose ACP's confidential information, compete with ACP, and/or attempt to further divert ACP's business. To prevent irreparable harm to ACP's business reputation and goodwill, for which ACP has no adequate remedy at law, a temporary restraining order will issue to preclude Roumen and Pannell from further working for Diversicare, not altogether, but in any manner that would violate their respective Agreements.

While courts have recognized that a temporary restriction prohibiting someone from pursuing a livelihood in the manner he chooses should not be imposed lightly, such a restriction can be warranted particularly where the departing employee has participated in theft of confidential information prior to his departure, and particularly where circumstances indicate that he intends to, or will likely use that information to assist a competitor and harm his former employer. *See Bimbo Bakeries*, 613 F.3d at 118-19 (finding balance of hardships weighed in favor of injunction prohibiting bakery executive from working for competitor during pendency of lawsuit where employee had accessed a number of confidential documents during the final weeks of his employment and accepted employment at a similar, competing business). Here, the harm of ACP's confidential information being disclosed and used outweighs the harm of Roumen and Pannell not being able to be employed at Diversicare in a manner that would violate the terms of their Agreements with ACP, and it outweighs any potential harm to Diversicare of not being able to develop and implement competing services for itself or for outside entities (which Defendants insist they will not do anyway).

As for the public interest, Nevada law expressly provides for the enforcement of restrictive covenants within employment agreements and trade secret misappropriation through the use of injunctive relief. *Fernandez*, 787 P.2d at 774; Nev. Rev. Stat. § 600A.040. While the right of a business to be protected against unfair competition stemming from the usurpation of confidential information must be balanced against the right of an individual to the unhampered pursuit of the occupations and livelihoods for which he is best suited, the public interest favoring

the protection creativity and entrepreneurial development outweighs the temporary restriction on Diversicare's business, and on Roumen and Pannell's duties while employed at Diversicare.

## IV.  CONCLUSION

The Court, having fully considered the parties' briefs and oral argument presented at the hearing, finds that although several factual disputes remain among the parties, ACP has satisfied the required elements for a temporary restraining order.  As such, the Court hereby issues a temporary restraining order as follows:

1. Roumen and Pannell shall for the period identified below be enjoined from:

(a) Any and all employment with Diversicare or any entity affiliated with Diversicare in any capacity which would violate their respective Confidentiality and Intellectual Property Rights Agreements.  This means that Roumen and Pannell are prohibited from employment with Diversicare or any entity affiliated with Diversicare in which Roumen and/or Pannell's job functions relate to goods and services that are the same as or similar to the goods and services provided by ACP, and/or involve developing or assisting Diversicare in the development, distribution, or specification of medical devices, and/or any educational programs which involve the use of any products or services similar to or competitive with those of ACP (including, without limitation, products and services similar to ACP's treatment methods and using ACP's Written Materials);

(b) Engaging in any business that is the same as, similar to, or competitive with ACP's business;

(c) Soliciting any ACP customers, attempting to induce any ACP customers to terminate business with ACP, diverting or attempting to divert patronage or business of ACP customers, and developing or assisting with the development, distribution, or specification or medical devices and/or any educational programs which involve the use of medical devices and/or products and services similar to or competitive with ACP; and

(d) Using or disclosing ACP's confidential information (such as customer lists, price charts, and the like) in any manner, including ACP's proprietary Written Materials.

2. Diversicare and any entity affiliated with Diversicare shall for the period identified below be enjoined from:

(a) Employing Roumen and/or Pannell in any capacity which would violate their respective Confidentiality and Intellectual Property Rights Agreements.  See paragraph 1(a) above; and

(b) Using any knowledge or information obtained from or derived by reference to ACP's Written Materials or confidential client lists, pricing schedules, etc. to solicit any ACP customers, attempt to induce any ACP customers to terminate business with ACP, divert or attempt to divert patronage or business of ACP customers, and use, develop or assist with the development, distribution, or specification of medical devices and/or any educational programs which involve the use of medical devices and/or products and services similar to or competitive with ACP.

3. Roumen, Parnell, and Diversicare will return as soon as is practicable all physical copies of the Written Materials (originals and any reproductions) and shall destroy any electronic copies in whatever format.  Defendants are NOT prohibited at this time from using or disclosing the treatment methods—which methods the Court is not yet satisfied constitute trade secrets—so long as they do not violate the confidentiality and/or non-compete agreements.  The fact that the treatment methods are likely covered by the confidentiality and noncompete agreements whether or not they constitute "trade secrets" under state law makes the trade-secret argument superfluous for the purposes of an injunction, at least for the duration of the confidentiality and noncompete agreements.

4. To the extent Diversicare, Roumen, and/or Pannell have electronically stored any ACP confidential information, Written Materials, or portions thereof, such electronic information shall be immediately printed in hard copy form; the hard copy shall be delivered to and preserved by counsel for the Defendants; an electronic copy of all ACP confidential information and Written Materials contained on any of Defendants' electronic storage devices, or on devices of affiliated entities, shall be made, preserving all metadata and made in native

format, and the electronic copy shall be preserved by counsel for Defendants; thereafter any and all ACP confidential information and trade secrets shall be immediately removed from Defendants' systems and databases. Defendants shall certify compliance by affidavit(s). Furthermore, a copy of all printed and electronic materials shall be delivered to counsel for ACP.

5. ACP shall post security with the Clerk of the Court in the amount of five thousand dollars and zero cents ($5000.00) (the "Security").

6. This Temporary Restraining Order shall remain in effect until 5:00 p.m. PDT on August 24, 2011.

IT IS SO ORDERED.

Dated this 22nd day of August, 2011, 1:30 PM PDT.

_____
ROBERT C. JONES
United States District Judge